30732.   HALL BROTHERS HATCHERY INC. *v.* HENDRIX.

Decided March 1, 1945.

*E. D. Kenyon, Scott, Dunaway, Riley & Wiggins,* for plaintiff in error.

*Clint W. Hager, J. F. Kemp, W. R. Tucker,* contra.

Sutton, P. J.   Harold M. Hendrix instituted an attachment proceeding against Hall Brothers Hatchery, a non-resident corporation, for the sum of $3000.   The plaintiff filed his declaration in attachment in two counts, and alleged in count 1 that during November and December, 1942, he purchased from the defendant 9100 baby chickens at the cost of $1189; that the defendant expressly warranted said chickens to be sound, normal, and healthy; that they were unhealthy and failed to develop to such size as to be salable, and that he sustained a loss in excess of $3000 because of a breach of express warranty by the defendant; that out of the first batch of 5000 chickens he purchased from the defendant on November 4, 1942, for $650, only 830 lived, and out of this number he sold 580 for $339.82, and the remaining 250 are worthless, for they have never grown to such size as to be salable; that of the 2100 chickens he purchased on November 11, 1942, at a cost of $279, he was able to sell 1300 for $882.18, and that the remainder are worthless for they have never developed to such size as to be salable; that of the 2000 chickens purchased December 29, 1942, at a cost of $260, only 65 survived, and that they are worthless; that he expended the total sum of $1296.70 for feed for the chickens; that when he purchased them he was engaged in the business of raising chickens for the market and

trading generally in chickens for a profit; that he purchased said chickens from the defendant for the purpose of feeding them and growing them to broiler size, to be placed on the market for sale for profit and gain, and that said plan and purpose was in the contemplation of the parties at the time he purchased them, and that the damages sustained by him are traceable solely to the breach of the defendant's warranty; that had said chickens been sound, healthy, and normal, he could have realized profits to have repaid him for his costs and expenditures of $1537.60, and for him to have realized net profits of $200 per thousand, or the sum of $1820, or a grand total of $3357.60; that he was free from fault, and was in no way responsible for the damages sustained by him; and prayed judgment for $3000. The allegations in count 2 are identical with those of count 1, except it is alleged that said chickens were impliedly warranted to be reasonably suited for the use intended. The defendant filed an answer in which it denied that it sold the chickens in question to the plaintiff and denied that it was responsible to him in damages for any sum whatsoever. The jury returned a verdict for the plaintiff for $2500. The defendant made a motion for new trial which was overruled, and the defendant excepted.

■ In support of the plaintiff's theory that he purchased the chickens from the defendant hatchery, and as to the express and implied warranties, he testified: " My business now is farming and growing chickens; I have been growing chickens for about three years. . . On or about November 4, I bought a batch of chickens from Hall Brothers [Hatchery] through their agent, Mr. Gentry. . . I placed an order with him for this 5000 batch on November 4, 1942; that order was placed with him at Martin Feed & Poultry Company. I was getting feed at that time from Quaker Oats and he [Gentry] was their representative. I gave him that order for the feed, and he approached me there about selling me some chickens. . . Mr. Martin was putting in a hatchery at that time in his warehouse, and I was complaining about some local hatched chickens, and Mr. Gentry said, 'Well, you have been having good success with Hall, let me sell you Hall's,' and I told him to send me 5000. . . I purchased another batch of chickens around November 11, 1942, about 2100. I placed that order through Mr. Gentry. . . I placed that order between there

[home] and here, or after I got here, one, . . but I am positive I placed it with him. On December 9, 1942, . . we were in there talking [at the office of Martin Motor Company], Mr. Gentry and I, and I told him a good number of that 5000 had died, and I didn't want to lose the time on the 5000, . . he said, 'Let me send you 2000 Hall cockerels to go in that other end [of the house], and let them all come out about the same time.' . . He was talking about these other chickens dying. He said, 'Well, chickens are better now than they were then. . . There might have been a week or two a bad batch comes through, but the best chickens you will get is Hall's cockerels. Let me ship you 2000 of them to go in the other end of the house.' I told him all right. He said, 'Mr. Martin has a hatchery here . . my chickens are better than local hatched stuff.' He said they were the best chickens that I could get at that time, best on the market. I told him I was buying chickens to grow out and sell as broilers. At the time I purchased these chickens through Mr. Gentry, he represented them to be first class, normal, healthy chickens. . . I told him that I had hard luck with them, something was wrong with the chickens [with reference to the 5000 lot], and I wanted the best chickens I could get; I was thinking of getting some from Mr. Martin locally here, and Mr. Gentry told me the Hall crosses were the best chickens on the market at that time. . . When I purchased 2000 in December, 1942, I told him at that time I had trouble with the other batches. He told me at that time to take these and try them out and see how they worked out. I was dissatisfied with the other two batches dying, and I made that fact known to Mr. Gentry. . . After I had trouble with these, this 5000 batch and this 2100 batch, I went to see Mr. Gentry. I don't remember whether I went to see him or whether he came to see me. I believe we met up at Gainesville here, and I'd tell him that they were dying, and . . he told me that chickens were coming in better then, and to let him place 2000 more over there in that large house, in this 5000 house where a portion died out, and put 2000 more in that house to grow out and not have the space empty. He said he could send me Hall cockerels, and at that time some of these 5000 had died out, a good many, and I was replacing them with these."

It appears from the testimony of the plaintiff that although he ordered the chickens direct from the defendant's agent, Gentry, the delivery was to be made to the agent or to Martin Feed & Poultry Company, and that Martin Feed & Poultry Company was to finance the operation. The plaintiff testified, "When I first contracted [for] the chickens, I placed the order with Mr. Gentry, and he was to ship me Hall chickens, and they were shipped either to him or to Martin Feed & Poultry Company. . . and Mr. Johnny Martin financed the sale of those chickens. I went to the Martin warehouse and got them, both the 5000 batch and the 2100 batch. . . The first I saw, they were to be shipped to Martin Feed & Poultry Company, and he was to finance them and send them to me. I didn't put any order in to Martin . . and I signed a note for [to] Martin Feed & Poultry Company for the chickens; I signed a note payable to them. . . Later I got a batch of 2000 chickens. I placed that order with Mr. Gentry . . and he said he would ship me 2000 Hall cross cockerels, either ship them to Mr. Gentry at Gainesville or [to] Martin Feed & Poultry Company, let Mr. Martin sign for them . . and I signed a note to Martin Feed & Poultry Company for those chickens . . but the understanding with Mr. Gentry was, I placed my order with him, he would send that order to Hall Brothers, and they would ship the chickens to Gainesville, either to him or to Martin Feed & Poultry Company, and the two of us saw Mr. Martin and he said he would finance the chickens, it would be all right to ship them to him or ship them to Mr. Gentry, either one, that he would finance them and let me pay Mr. Martin. Mr. Martin was only financing them, and the only payment I made was to Martin Feed & Poultry Company." The plaintiff further testified that he paid the notes and destroyed them and that he signed receipts for the chickens, wherein it was stipulated that the title to the chickens should remain in Martin Feed & Poultry Company until all obligations due by the plaintiff to the company were paid.

John H. Martin testified that he was in the business of Martin Feed & Poultry Company and engaged in hatching and selling baby chickens to growers, and furnishing them feed and buying the broiler chickens and placing them on the market, and that he also handled chickens from Hall Brothers Hatchery. He testified: "I remember Mr. Harold Hendrix's deal in 1942. I

don't remember each little detailed amount, but I remember we were asked to finance them and we did. . . He [Hendrix] bought his chickens from Mr. Gentry, or somebody else; it was not me. I mean Mr. Hendrix purchased them directly through Mr. Gentry . . and we financed them . . I don't think we agreed to furnish the feed, just the chickens. As far as I know we didn't actually turn over to him any money. I just approved them—the financing of the chickens. Sometimes the chickens from Hall Brothers Hatchery were billed to Mr. Gentry and we paid him. Not all of them were billed to me, some of them were billed to Mr. Gentry. Now, I don't know about those particular batches. . . I do know Mr. Gentry had those three batches billed to him and we paid Mr. Gentry for them. I don't know whether those three batches were billed to Mr. Gentry or us, all I know, we were just financing them. I don't know whether the chickens we handled from Hall Brothers were billed to Hendrix. We put the money up. That is all I know. I approved the financing and somebody in the office handled the details. About those 9100 chickens in question that Hendrix bought from Hall Brothers Hatchery, we just financed them . . . Mr. Hendrix evidently made whatever arrangements that were made about the purchase of those chickens with Mr. Gentry. Our conversation with Mr. Gentry was, he wanted us to finance it. We agreed to finance it in order for him to make a profit from the Quaker Oats Company which he represented at that time."

The plaintiff testified that he paid the notes to Martin Feed & Poultry Company in the principal sum of $650 for the lot of 5000 chickens; $279 for the 2100, and $260 for the 2000 lot; that he expended for feed the sum of $627.70 for the first lot; $600 for the second lot, and $69.50 for the last lot; that out of the first lot of chickens he sold 580 for $339.82, and that the remainder died; that of the lot of 2100 he sold 1300 for $882.18, and that out of the last lot of 2000 chickens, only 65 lived, and they were worthless, due to lack of growth; that his total expenditure for chickens, feed, etc., was $2759.60 and his sales were $1222, making a total loss in money of $1437.60; that he based his prospective profit of $1800 on the basis of $200 a thousand at the time; that his profits would run from $150 to $250 per thousand chickens at that particular time and would be a normal

average; that was the net profit per thousand after paying for chickens and feed and expenses. He further testified as to the number and character of his chicken houses, brooders, and the care in general of said chickens, both by himself and his employee, and that the damages sustained by him were not attributable to any fault of his. His testimony as to the diseased nature of the chickens in question was supported by a number of neighbors and other witnesses, who also testified as to the suitability of the plaintiff's plant for raising broilers, and as to his care in an effort to grow them successfully. A number of witnesses testified that profits derived from raising chickens for broiler purposes varied from $65 to $300 per ·thousand, depending upon the character of the chickens and the care they received and the market price at the time.

Except for documentary evidence introduced by the defendant hatchery, H. Z. Gentry was the only witness. He denied positively and unequivocally that he as agent for the defendant hatchery sold the chickens in question to the plaintiff, and testified they were sold to Martin Feed & Poultry Company, and that after such sales to Martin Feed & Poultry Company, the defendant hatchery had no concern or business with the purchasers of chickens from Martin Feed & Poultry Company. That he at one time visited the plaintiff's premises and found the conditions there unsanitary and the heating conditions not conducive to raising chickens successfully.

The evidence in the case was in direct conflict as to whether the plaintiff, by agreement with Martin Feed & Poultry Company and the defendant's representative, purchased the chickens from the defendant, to be delivered to Martin Feed & Poultry Company, who would pay the defendant and finance the deal for the plaintiff upon his giving a retain-title note to Martin Feed & Poultry Company, or whether the chickens were not sold to the plaintiff by the defendant, but were sold to him by Martin Feed & Poultry Company as a straight sale. The jury resolved the conflict and the other issues in controversy in favor of the plaintiff, and the court did not err in overruling the motion for new trial on the general grounds.

■ It was not error, as contended in special ground 1 of the motion, for the court, while instructing the jury on express and

implied warranty, to charge the jury as follows: "So in this case, gentlemen, the suit being in two counts, if you find that there was an express warranty as to the soundness of the property said to have been sold (but the court does not say any property was sold), or if you find there was no express warranty, then under the second count, if you find there was an implied warranty, that is, such a warranty as the law itself implies and imposes upon every seller, why then, of course, you would find in favor of the plaintiff upon that theory of the case."

■ Special ground 2 complains that the court erred in charging the jury as follows: "I charge you that if Mr. Hendrix borrowed money from Mr. Martin or Mr. Martin's company to pay for the chickens and gave his note, that he would have to repay the amount borrowed from Mr. Martin or his company, and the mere fact that he repaid the loan that he got from Mr. Martin would be no bar to his right to recover in this case as against the hatchery company, if liability has been shown in the manner and way which I have charged you, and that would be true, gentlemen, irrespective of any form of note which he may have given to Mr. Martin." This charge was not error. The court immediately before giving the charge complained of had instructed the jury that if they believed from the evidence that the defendant sold the chickens in question to Martin Feed & Poultry Company, and not to the plaintiff, the plaintiff could not recover; and in no event could the plaintiff recover against anyone, unless the jury believed from the evidence that the chickens were unhealthy, not normal, and not suited for the purpose for which they were purchased; but if the plaintiff bought the chickens from the defendant, "and if the defendant hatchery company in its effort to secure the payment of them, shipped these chickens to Mr. Martin or to Mr. Martin's feed company and that Mr. Martin's company or Mr. Martin had no interest in the matter except to finance this transaction for Mr. Hendrix, then I charge you that the issues of this case would be as between Mr. Hendrix and the defendant, the hatchery company."

4. Special ground 3 alleges that the following charge was erroneous, because it was argumentative and was an expression of opinion on the part of the court: "I charge you, gentlemen, that if these chickens were bought by Mr. Hendrix from the

defendant, the hatchery company, and if they were represented to be sound and healthy, [and] if, as a matter of fact, they were not, and were not reasonably suited for the purpose for which they were bought, why then I charge you that the plaintiff in this case ought to recover, irrespective of any transaction between him and Mr. Martin and Mr. Martin's company." This charge followed immediately after the charge complained of in ground 2 of the motion, and while the expression "ought to recover" may have been inapt, still the court qualified this expression in the next sentence by telling the jury: " In other words, if you believe from the evidence that he has shown by a preponderance of the testimony that he is *entitled to recover,* of course, then you would be concerned about the amount," etc. This charge and the one complained of in ground 2 of the motion when considered in connection with the charge as a whole were not erroneous for any reason assigned. The main issue in the case was whether the plaintiff bought the chickens from Hall Brothers Hatchery or from Martin Feed & Poultry Company, and we think the court fully and fairly charged the jury with respect to this issue, as well as to the other phases of the case.

5. Grounds 4 and 5 of the motion except to statements made by the court during the trial of the case as to what he intended to charge the jury, and these grounds are controlled by the rulings made in divisions 3 and 4 of this opinion, the statements complained of in these grounds being substantially the same as the portions of the charge excepted to.

6. Special ground 6 complains that the following evidence was illegally admitted by the court: "My profit would run from $150 to $250 per thousand chickens, would at that time, that particular time, around a couple of hundred dollars, I would say would be a normal average at that time," on the ground that what he would have made on other batches of chickens would not be relevant. The plaintiff's suit was for loss of profits, among other things, for breach of contract for the three lots of chickens here involved. The plaintiff testified, in this respect, that he was in the chicken business at that time, that he bought the chickens in question to feed and raise to broiler stage and then to sell them at a profit, that all this was understood between him and the defendant hatchery when he bought the chickens. He testified that $200 per thou-

sand would have been a normal profit on the chickens at that time, and he was referring to these particular chickens. The Code, § 20-1407, provides: " Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach, and such as the parties contemplated, when the contract was made, as the probable result of its breach." It was held in *Hirsch* v. *Schofield's Sons Co.,* 8 *Ga. App.* 284 (3) (68 S. E. 1076) : " Where a plaintiff shows a breach of either an express or an implied warranty, profits not dependent upon speculative contingencies, but which can be shown to be certain, fixed in amount, and the direct fruit of a valid contract, reasonably to be anticipated from the breach, are recoverable, where it appears that the loss of the profits is due solely to the defendant's breach of his contract." See *Reynolds* v. *Speer,* 38 *Ga. App.* 570 (4) (144 S. E. 358), to the same effect; also, *American Agricultural Chemical Co.* v. *Rhodes,* 139 *Ga.* 495 (2) (77 S. E. 582). The court did not err in admitting the evidence complained of in this ground of the motion.

7. It is contended in ground 7 that the court erred in refusing to exclude the testimony of the plaintiff and John H. Martin to the effect that the chickens in question were purchased by the plaintiff from Hall Brothers Hatchery, on the ground that the testimony tended to vary and contradict the written contracts then in evidence, referring to the notes and receipts given by the plaintiff to Martin Feed & Poultry Company for said chickens; it being contended by the plaintiff in error that the notes and receipts showed that the chickens were purchased by the plaintiff from Martin Feed & Poultry Company. It was contended by the plaintiff that the agreement between him and Martin and Gentry, agent for the defendant hatchery, was that Martin was to finance him in purchasing these chickens from Hall Brothers Hatchery, and there was testimony by both the plaintiff and Martin substantiating this contention. Under this theory the documentary evidence was merely explanatory of the transactions as between the parties, and the testimony complained of was not objectionable for the reasons assigned in this ground of the motion, and the court did not err in refusing to exclude the testimony of Hendrix and Martin.

8. The verdict was authorized by the evidence; no material error of law appears; and the court did not err in overruling the motion for a new trial.

*Judgment affirmed. Felton and Parker, JJ., concur.*